**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BROOKLYN PAIGE TEETERS,**

     **Plaintiff,**

**vs.**                           **CIVIL ACTION NO. 2:19-CV-00526**

**ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. By Order entered July 18, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 12), and Defendant's Brief in Support of Defendant's Decision. (ECF No. 17)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 12), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 17); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Brooklyn Paige Teeters (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on June 23, 2016 (Tr. at 173-174) alleging disability beginning December 15, 2011[1] (Tr. at 189) due to seizures. (Tr. at 189) Her claim was initially denied on August 9, 2016 (Tr. at 74-84) and again upon reconsideration on December 9, 2016. (Tr. at 88-94) Thereafter, Claimant filed a written request for hearing on January 17, 2017. (Tr. at 95-97)

An administrative hearing was held on July 13, 2018 before the Honorable Nathan Brown, Administrative Law Judge ("ALJ"). (Tr. at 30-53) On September 25, 2018, the ALJ entered an unfavorable decision. (Tr. at 14-29) On October 9, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 166-169, 170-172) The ALJ's decision became the final decision of the Commissioner on May 20, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-8)

On July 17, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) Defendant (hereinafter referred to as "the Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 12), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 17) Consequently, this matter is fully briefed and ready for resolution.

---

[1] At the administrative hearing, Claimant amended her alleged onset date to November 30, 2014. (Tr. at 34) The ALJ noted same and recognized that for purposes of SSI, a claimant cannot receive retroactive benefits pursuant to 20 C.F.R. § 416.335, however, he considered the complete medical history consistent with 20 C.F.R. § 416.912. (Tr. at 17)

**Claimant's Background**

Claimant was nineteen years old when she filed for disability and would be defined as a "younger person" throughout the underlying proceedings. <u>See</u> 20 C.F.R. § 416.963(c). (Tr. at 23) Claimant was diagnosed with epilepsy and had been treated by a specialist since she started having seizures at the age of 15. (Tr. at 35) She quit school in the tenth grade due to her seizures, but planned to get her GED. (Tr. at 39) Claimant has never worked on advice of her doctor. (Tr. at 40)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id</u>. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. <u>Id</u>. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. <u>Id</u>. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

**<u>Summary of ALJ's Decision</u>**

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since June 23, 2016, the application date. (Tr. at 19, Finding No. 1) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairment: epilepsy with vague nerve stimulator (VNS) implantation. (<u>Id</u>., Finding No. 2) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (<u>Id</u>., Finding No. 3) The ALJ then found that Claimant had the residual functional capacity ("RFC") to

> lift and carry 10 pounds occasionally and less than 10 pounds frequently, sit six hours, stand and/or walk up [to] two hours each in an eight-hour workday. She can push/pull as much as [she] can lift and carry. The claimant can never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs, balance, and crawl. She can frequently stoop, kneel, and crouch. The claimant can never work at unprotected heights or with moving mechanical parts and can never operate a motor vehicle. She can occasionally work in weather and have occasional exposure to humidity, wetness and frequent exposure to extreme cold, extreme heat, and vibration. The claimant is limited to performing simple work and to making simple work related decisions. She must work in a low stress environment defined as no fast-paced production requirements, only occasional decision making required, and only occasional changes in the work setting.

(Tr. at 20, Finding No. 4)

At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 23, Finding No. 5) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, limited education, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 6-9) Finally, the ALJ determined Claimant had not been under a disability since June 23, 2016, the application filing date. (Tr. at 24, Finding No. 10)

**Claimant's Challenges to the Commissioner's Decision**

Claimant has asserted four grounds supporting her argument that the ALJ's unfavorable decision did not comply with legal standards.

First, the ALJ failed to develop the record in consulting a medical expert that Claimant's impairment did not meet or equal Listing requirements at step three. (ECF No. 12 at 1)

Second, the ALJ's evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms had on her functional limitations did not comply with Social Security Ruling (SSR) 16-3p or with 20 C.F.R. § 416.929(c)(3) because the ALJ did not clearly articulate his reasoning for finding that Claimant's allegations were inconsistent with the record despite numerous instances that contradicted his conclusions. (Id. at 6-9)

Third, the ALJ did not properly consider or afford the appropriate weight to the opinion of Claimant's treating physician, Samrina Hanif, M.D., given that this was the only medical opinion in the record. (Id. at 9-11) Finally, because the ALJ gave little weight to Dr. Hanif's opinion with respect to Claimant's functioning in the workplace, the RFC assessment is flawed, especially given the absence of any other RFC-related medical opinion on file. (Id. at 11-12)

Because of these errors, Claimant argues the final decision is not supported by substantial evidence and asks the Court to remand this matter to correct these errors. (Id. at 12)

In response, the Commissioner contends that the ALJ appropriately evaluated Claimant's subjective statements against the evidence of record, provided examples from the evidence that substantiated his findings, and articulated his reasons for his conclusions in compliance with legal standards. (ECF No. 9-12) The RFC assessment is further proof of the ALJ's proper consideration of the limiting effects resulting from Claimant's symptoms. (Id. at 12)

Next, the Commissioner argues that the ALJ appropriately discounted Dr. Hanif's opinion, explaining that it was inconsistent with his own treatment records, which showed Claimant's seizures were not as frequent or severe due to medication changes and VNS usage. (Id. at 13-14) Additionally, the ALJ adopted many of Dr. Hanif's restrictions in the RFC assessment. (Id. at 14-15) Finally, the Commissioner states that the ALJ is not required to obtain a medical opinion to fashion the RFC assessment, as it is an administrative finding, not a medical assessment. (Id. at 15-17) Consistent with the Regulations, the ALJ fashioned the RFC based on his review of the entire record. (Id. at 17) To the extent that Claimant has asserted the ALJ failed to develop the record with respect to the step three finding, the Commissioner argues that because Claimant did not develop this argument in her brief, this argument is waived. (Id., n.6; citing United States v. Brown, 742 F. App'x 742, 745 n.3 (4th Cir. Aug. 7, 2018) (citing Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017))

The Commissioner contends the final decision is supported by the substantial evidence and asks this Court to affirm. (Id. at 18)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Evidence Prior to Relevant Period:

Claimant has a history of epilepsy beginning in 2012 when she was fifteen years old. (Tr. at 1642, 1635) By April 2013, she began treatment with neurologist Samrina Hanif, M.D.; she was diagnosed with generalized convulsive myoclonic seizures and began seizure medication, Keppra. (Tr. at 1635, 1637) In August 2013, Claimant's seizure medications were adjusted for her pregnancy (Tr. at 1622), and her seizures remained stable with no breakthrough seizures through November 2013. (Tr. at 1609, 1613)

After her November 2013 visit, Claimant did not return to Dr. Hanif until October 2014. (Tr. at 1604-1606) At that time, she reported her last seizure was shortly after the birth of her child in March 2014. (Tr. at 1604) She reported one breakthrough seizure in the fall of 2014. (Tr. at 1599)

At her next appointment in March 2015, Claimant was 8 weeks pregnant with her second child and continued to take Keppra as prescribed. (Id.) In May 2015, Claimant reported less frequent seizures with an increased dosage of Keppra, but also a breakthrough seizure in April 2015 resulting in an ER admission. (Tr. at 1592, 1598) In August 2015, Claimant had three clusters of seizures with each requiring inpatient admission. (Tr. at 312-345) Later that month, a vagal nerve stimulation (VNS) was placed, and Claimant subsequently reported decreased seizure frequency and termination of a number of seizure events using on-demand stimulation. (Tr. at 304)

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

By the end of August, Dr. Hanif noted Claimant was stable on Keppra, Topamax, and VNS. (Tr. at 303) Claimant reported no seizures in September 2015, but began experiencing clusters of seizures at the beginning of October 2015. (Tr. at 288) A few days later, her second child was born via elective C-section. (Tr. at 277)

Claimant returned to Dr. Hanif in February 2016 and reported that she continued to take Keppra and Topamax as directed and that she had four to five seizures since her last visit in October 2015. (Tr. at 272-273) Claimant stated that although on-demand stimulation (VNS magnet swipes) alone did not prevent a seizure, if her husband is able to catch her face twitching that precedes the seizures, he usually has her take an extra dose of Keppra and swipes the magnet, which together can "prophylactically abort the progression of the seizure"; she further stated that she has had some dizziness and problems with concentration since beginning Topamax, but the side effects were tolerable. (Tr. at 272) Dr. Hanif ordered an EEG and continued her mediation. (Tr. at 275)

In February 2016, Dr. Hanif completed a seizure residual functional capacity questionnaire and a medical source statement. (Tr. at 241-245, 247-252) She indicated that Claimant had two seizures per month that last two to three minutes and that she has little warning before a seizure. (Tr. at 241) When a seizure occurs, Dr. Hanif noted Claimant requires something soft under her head, her glasses removed, her tight clothes loosened, hard and sharp objects removed from the areas, and her body turned to the side to allow saliva to drain from mouth. (Tr. at 242) She noted that Claimant's postictal manifestations included confusion and exhaustion for two to three hours. (Id.) Dr. Hanif noted that Claimant had no history of injury during a seizure, but did have a history of incontinence during a seizure. (Tr. at 243) She also noted that Claimant's medication makes a difference in the frequency of seizures. (Id.) Dr. Hanif assessed that Claimant's seizures would

likely disrupt the work of co-workers, she would require more supervision at work than an unimpaired worker, she could not work at heights, and she could not drive a car, operate machinery or take a bus alone. (Tr. at 242-244) She indicated Claimant would miss about three days of work per month, but would not need to take unscheduled breaks during a workday. (Tr. at 244, 252) Dr. Hanif assessed that Claimant's seizures would frequently interfere with her attention and concentration, but she was capable of low stress jobs. (Tr. at 248) She explicitly placed no limitation on her ability to sit, walk, stand, reach, handle, or finger. (Tr. at 249, 251) She declined to impose any lifting, carrying, or postural limitations. (Tr. at 251) She ultimately assessed that Claimant was medically disabled since February 2015 and incapable of working a full-time schedule at any level of exertion since August 2015. (Tr. at 245, 252)

At the end of March 2016, Claimant reported five seizures since her last visit and lasting from 60 seconds to 2 ½ minutes, with the most recent having occurred three days prior. (Tr. at 267) Her ambulatory EEG was abnormal and consistent with primary generalized epilepsy. (Tr. at 259, 266)

At the end of April 2016, Claimant reported no seizures since her last visit in March. (Tr. at 259) Claimant reported that Keppra used to cause drowsiness and Topamax used to cause dizziness, but those side effects were better now. (Id.) Dr. Hanif noted Claimant continued to have multiple seizures on Keppra, Topamax and VNS and added Fycompa. (Tr. at 263) In May 2016, Claimant again reported no seizures since her last visit. (Tr. at 254)

Medical Evidence During Relevant Period:

In July 2016, Claimant again reported no seizures since her last visit in May, and Dr. Hanif continued Claimant's medications (Keppra, Topamax, and Fycompa). (Tr. at 1576, 1580) In

September 2016, Claimant reported having one seizure in August and Dr. Hanif increased her dosage of Fycompa. (Tr. at 1572, 1575) In November 2016, Claimant sought emergent care after having short-lived partial seizures that day. (Tr. at 360) She reported that she did not lose consciousness and had no postictal symptoms, and the seizures resolved on their own. (Id.)

At the end of January 2017, Claimant reported four seizures since her last visit in September. (Tr. at 1568) She denied side effects from medication (no aggressive thoughts or dizziness). (Id.) Dr. Hanif increased her dosage of Fycompa, continued Keppra, decreased her dosage of Topamax, and adjusted her VNS. (Tr. at 1571) In April 2017, Claimant's husband reported worsening seizures and requested Ativan. (Tr. at 1563) Dr. Hanif increased Fycompa, continued Keppra and Topamax, and adjusted her VNS. (Tr. at 1566) In August 2017, Dr. Hanif discontinued Fycompa (caused irritability), started Depakote, continued Keppra and Topamax, and adjusted her VNS because Claimant said it was causing her pain and she wanted a lower current. (Tr. at 1549, 1554, 1557, 1562) In September 2017, Claimant reported one seizure, but she was unable to do on-demand stipulation (swipe the magnet). (Tr. at 1549) Dr. Hanif continued her medication and adjusted her VNS. (Tr. at 1552)

In March 2018, Claimant reported three large seizures since her last visit in September 2017. (Tr. at 1542) Dr. Hanif adjusted her medication dosages and VNS. (Tr. at 1547-1548) In May 2018, Claimant reported increased pain and difficulty breathing with VNS. (Tr. at 1530) Dr. Hanif decreased her VNS settings due to side effects, and continued her medications. (Tr. at 1533)

Between July 2016 and March 2018, Claimant's physical examinations were normal: intact cranial nerves, full muscle strength, normal reflexes, and normal gait. (Tr. at 1531, 1554, 1556, 1565, 1578)

**The Administrative Hearing**

Claimant Testimony:

Claimant explained that the VNS implant has a magnet that she must slide to help her throughout the day; during a seizure, her husband usually has to slide it to try to make her come out of the seizure or to slow it down. (Tr. at 35-36) When that happens, Claimant is unaware of what is going on because she's in a seizure. (Tr. at 36) She stated that sometimes the VNS works and sometimes it does not, and when it does not, her husband has to put her on her side and use water to keep her stable until she can come out of the seizure on her own. (Id.)

Claimant testified that she is totally unaware when a seizure is coming on. (Id.) After a seizure, Claimant stated that she feels very dizzy, weak, with migraines and doesn't know what's going on, or know her own name, what year it is or the people around her. (Tr. at 37) She stated that she feels like that for about 45 minutes to an hour after having a seizure. (Id.) She sleeps during that period to try to get over these symptoms. (Id.)

Claimant testified that in terms of affecting her ability to do things around the house, her seizures sometimes, but not always did, but it also depended on whether she had a seizure that day and how long it lasted. (Tr. at 38) For instance, after a seizure, she is unable to do any chores. (Id.) Claimant stated that she is restricted from driving due to her seizures and has never driven and never had a driver's license. (Id.)

Claimant testified that she was unable to complete high school or continue with homeschooling due to her seizures. (Tr. at 39) Although she went to Penn Foster for a while to obtain her GED, she must pay them some money in order to finish. (Id.) She stated that Dr. Hanif advised her not to work due to her seizures. (Tr. at 40)

Claimant testified that she and her husband have three children and that she takes care of them, however, when she has a seizure, then her husband helps with childcare. (Tr. at 40-41)

<u>James Patrick Teeters, Claimant's Husband Testimony:</u>

Mr. Teeters testified that he has a full-time job as a manager at McDonald's and works the night shift, from 4 pm and returns home around 11pm or 12 am. (Tr. at 42-43) Mr. Teeters stated that while he's away at work, his father and Claimant's father stop by quite often to help out; Mr. Teeters works close by and is able to "fly home" if needed. (Tr. at 43)

Mr. Teeters explained that Claimant has two separate kinds of seizures. (<u>Id</u>.) The first is not as intense where her lips quiver or her eyes will shake or she'll "just be out in space" and he will give her medication or slide the magnet to try to stop it; sometimes this works, other times it doesn't. (Tr. at 44) The second kind of seizure is where Claimant will hit the ground and start shaking and she'll tense up her arms, neck, teeth and just shake and kick and hit anything. (<u>Id</u>.) For these more intense seizures, Mr. Teeters testified that he will just hold Claimant on her side until she comes back, and afterwards, he will have her take a double dose of her medication per doctor's orders. (<u>Id</u>.)

Mr. Teeters stated that Claimant has the first kind of seizure quite often; when she gets brain scans, she has them even while talking. (<u>Id</u>.) He stated that Claimant will have these kinds of seizures anytime she's really tired or stressed out. (Tr. at 45) For the more intense seizures, Mr. Teeters estimated that Claimant had one of these seizures about a week or week and a half ago. (<u>Id</u>.) Mr. Teeters testified that he doesn't always know when Claimant is going to have one of these severe seizures, but estimated she may have about two to three per month, although it varies from month to month. (<u>Id</u>.) He said it was scary not being able to know when a seizure is going to

happen. (Id.) Mr. Teeters testified that sometimes it takes Claimant a few seconds or minutes to be okay after a seizure and other times it takes an hour. (Tr. at 46) He will ask her what year it is or her name to help Claimant remember where she's at because sometimes Claimant will take off running like she's trying to escape when she comes out of a seizure. (Id.)

Brian Bierley, Vocational Expert ("VE") Testimony:

When asked by the ALJ to consider a hypothetical individual with Claimant's age, education level, work history and the controlling RFC, *supra*, the VE responded that such an individual would be able to perform the following unskilled sedentary jobs: final assembler; inspector; and table worker. (Tr. at 48-49) The VE testified that if the person were to be off task consistently 15% or more of the time each month or miss more than one day per month consistently, that person would be precluded from all employment. (Tr. at 49-50) The VE testified that if an individual were to have an epileptic seizure at work, this would not necessarily preclude employment, but if it were to occur as frequently where the individual was off task 15% or more each month or miss one day per month consistently, then it would preclude employment. (Tr. at 50) Additionally, the VE testified that if the individual would require the need for personal assistance to try to help with seizures, this would be inconsistent with competitive employment because that would be more in line with supportive employment. (Tr. at 51-52)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

As an initial matter, Claimant has asserted that the ALJ failed to develop the record to the extent that a medical expert was not consulted when the ALJ determined Claimant's impairment did not meet or equal Listing criteria.[3] (ECF No. 12 at 1) Claimant does not expand any further on

---

[3] As noted by the Commissioner, Claimant neither specifically identifies the impairment, nor explains how an expert opinion was necessary or how the impairment met Listing criteria or how the ALJ failed to develop the record to this extent (ECF No. 17 at 17, fn6). Accordingly, given the paucity of any argument supporting this particular position, Claimant has waived any argument on this specific issue. Grayson O Company v. Agadir International LLC, 856 F.3d 307, 316 (4th Cir. 2017). It is nevertheless noted that Claimant refers to SSR 17-2p, entitled "TITLES II AND XVI: EVIDENCE NEEDED BY ADJUDICATORS AT THE HEARINGS AND APPEALS COUNCIL LEVELS OF THE ADMINISTRATIVE REVIEW PROCESS TO MAKE FINDINGS ABOUT MEDICAL EQUIVALENCE" in support of her brief argument on this issue. 2017 WL 3928306 (March 27, 2017). This Ruling did not become effective until March 27, 2017 and post-dates Claimant's claim. In any event, SSR 17-2p specifically provides that:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, ***we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding*** that the individual's impairment(s) does not medically equal a listed impairment.

Id. at *4 (emphasis supplied). Further, there is no duty imposed by the Regulations applicable to Claimant's claim that requires an adjudicator to obtain a medical opinion prior to rendering a third step finding. Therefore, Claimant's

this argument, however, she also contends that the ALJ deviated from legal standards by not obtaining a consultative medical opinion prior to assessing the RFC. (Id. at 11-12) Claimant argues that without any other medical opinion concerning her RFC of record, save for that of Dr. Hanif's, the RFC assessment is based upon the ALJ's own lay opinion. (Id.) Because Claimant also asserts that the ALJ improperly evaluated her treating physician's opinion as well as her symptomology as they relate to the RFC assessment, as a practical matter, those issues should be addressed first.

Evaluating Opinion Evidence:

20 C.F.R. § 416.927 governs the SSA's criteria for evaluating opinion evidence; per § 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Under § 416.927(c)(1), more weight is given to an opinion provided by a physician who examines a claimant than to a non-examining physician. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2).[4] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(c)(2). If the

---

argument that the ALJ should have obtained a medical opinion prior to finding Claimant's impairment did not meet Listing requirements lacks merit.

[4] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

The ALJ acknowledged Dr. Hanif's February 11, 2016 opinion wherein she stated that Claimant averaged two seizures per month; that Claimant was unable to drive or operate machinery that as a result of her seizures; that Claimant would be disruptive to her co-workers and would require supervision at work; that Claimant could not work at heights or power machines; and that Claimant was medically disabled as of February 2015. (Tr. at 22, 241-245) The ALJ also considered Dr. Hanif's medical source statement which indicated Claimant's prognosis was poor. (Tr. at 22, 247-252) Also considered were Dr. Hanif's opinions that Claimant's emotional factors contributed to the severity of her symptoms and functional limitations, that her symptoms would frequently interfere with her attention and concentration to perform simple work, although, Dr. Hanif believed Claimant was capable of low stress jobs. (Tr. at 22-23, 247-252) In addition, the

ALJ noted Dr. Hanif's opinion that Claimant could sit, stand, and walk about eight hours in an eight-hour workday, but due to her impairments, she would be absent at least three days per month and that as of August 10, 2015, Claimant was unable to work full time at any exertional level. (Tr. at 23, 247-252) Following this consideration, the ALJ assigned "little weight" to Dr. Hanif's opinion because of inconsistencies with Dr. Hanif's treatment records, specifying that "by April 1, 2016[5], Dr. Hanif indicated the claimant's seizures were stable. Furthermore, subsequent records support the claimant's condition improved with medication. In fact, the claimant reported only three seizures in five months." (Tr. at 23, 1529-1660)[6]

Earlier in his decision, the ALJ recognized that Dr. Hanif was Claimant's treating neurologist and that she had been treating Claimant since 2015. (Tr. at 21) In his examination of Dr. Hanif's treatment records, the ALJ noted that since her last office visit in August 2015, on September 24, 2015, Claimant reported no seizure activity to Dr. Hanif, although a progress note dated October 1, 2015 indicated Claimant reported experiencing three seizures the day before. (Id.) The ALJ further observed that Dr. Hanif's notes from February 11, 2016 indicated Claimant reported four to five seizures since October 2015 and that the VNS magnet was effective at interrupting the seizure. (Id.) Another follow up appointment with Dr. Hanif on March 29, 2016 shows that Claimant reported five seizures since her last visit, and that her examination was essentially normal. (Tr. at 22) A May 23, 2016 treatment note indicated Claimant reported no

[5] Following the undersigned's review of the medical record revealed that although there is no progress note specifically dated April 1, 2016, a treatment note dated March 29, 2016 indicates that Claimant reported having four to five seizures since her visit last October (Tr. at 267). This medical record further indicates that Claimant reported the side effects from her medications were "tolerable" (Id.) and it was noted that Claimant remained "stable on Keppra, Topamax and VNS" (Tr. at 271). The next treatment note, dated April 27, 2016, indicated that Claimant reported no seizures since her March 29, 2016 visit and was tolerating her medications well. (Tr. at 259)
[6] The ALJ appears to be referring to the medical records which indicated Claimant reported three seizures from August 2017 through March 2018 – which is seven months.

seizures since her last visit in April 2016 and that Dr. Hanif noted Claimant tolerated her medication well and that her epilepsy was stable. (Tr. at 22, 253-346) The ALJ also noted that Dr. Hanif's progress notes from July 2016 showed that Claimant denied seizure activity since May 2016, and by September 2016, Claimant reported only one seizure with no new complaints. (Tr. at 22, 1529-1660)

The ALJ acknowledged that in November 2016, Claimant went to the emergency room with complaints of seizures and that she reported that they were "short lived and resolved on their own"; while in the emergency room, there was no observation of a seizure, and she was discharged in stable condition. (Tr. at 22, 357-437)

Continuing his review of Dr. Hanif's treatment records, the ALJ noted that from January to April 2017 Claimant reported worsening seizure activity, causing Dr. Hanif to increase her medication and adding Depakote in August 2017. (Tr. at 22) The ALJ observed there was no indication of follow up visit until March 2018, at which time Dr. Hanif noted Claimant reported three seizures since her last visit in August 2017. (Id.) Another treatment note dated May 9, 2018 indicated that Claimant reported no seizures except for side effects of VNS, thus causing Dr. Hanif to decrease VNS titration and continued Claimant's medications. (Id.)

The ALJ next noted that although Claimant has seizures, her testimony concerning their severity and frequency was not supported by the evidence, and the evidence actually demonstrated that her seizures improved with VNS and medication. (Id.) The ALJ again noted that from August 2017 to March 2018, the medical records showed that Claimant reported only three seizures during that time and that her examinations were essentially normal. (Id.) The ALJ further noted that Claimant reported no difficulties performing activities of daily living, that she takes care of her

18

three children, that she performs household chores, that she "indicated effort to obtain a General Equivalency Diploma", and that "[t]he overall record supports her condition is stable." (Id.) The ALJ also acknowledged that although Claimant "experienced side effects of medication, the record indicates the side effects were mild and resolved." (Id.)

With respect to the other opinion evidence of record, the ALJ noted that at both the initial and reconsideration levels of review, neither medical consultant was able to render a determination because Claimant failed to submit forms.[7] (Tr. at 23) Although the ALJ gave the opinions little weight given the evidence obtained at the hearing level, again, the ALJ noted that the evidence of record revealed that Claimant's condition was stable. (Id.)

It is clear that the ALJ's discussion of the opinion evidence with the other evidence of record shows that the ALJ gave a thorough consideration of Dr. Hanif's opinions and compared her findings with the other evidence of record, which is clearly the intent of the pertinent Regulations, *supra*. To the extent that Dr. Hanif opined that Claimant was disabled, it is well known that the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. See 20 C.F.R. § 416.927(d)(3). Finally, with respect to the "good reasons" provided by the ALJ for not giving Dr. Hanif's opinions controlling weight, the ALJ has discharged his duty pursuant to Section 416.927(c)(2) and provided an adequate explanation allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

---

[7] See 20 C.F.R. § 916.916 ("You must cooperate in furnishing us with, or in helping us to obtain or identify, available medical or other evidence about your impairment(s). When you fail to cooperate with us in obtaining evidence, we will have to make a decision based on information available in your case.")

In sum, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence provided by Dr. Hanif is supported by substantial evidence.

Evaluation of Symptoms in Disability Claims:

Claimant also asserts that the ALJ failed to comply with Social Security Ruling 16-3p with respect to her subjective symptom analysis because he did not clearly articulate how he found Claimant's allegations inconsistent with the record or consider the factors endorsed by the Regulations to evaluate her symptoms when crafting the RFC. (ECF No. 12 at 6-9)

SSR 16-3p[8] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of

---

[8] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 416.929(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456

(4th Cir. 1990); <u>Davis v. Colvin</u>, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Here, the ALJ considered Claimant's history of epilepsy beginning at age 15 and that despite having a VNS implant, it did not always work. (Tr. at 21) He also noted that she stated that she is unaware when she is starting a seizure, but afterwards, she experiences weakness, dizziness, migraines and disorientation. (<u>Id</u>.) The ALJ also reviewed Claimant's medications, which included Topamax, Depakote, and Keppra (<u>Id</u>.) and that although she experienced side effects of these medications, the record indicated that the side effects were mild and resolved (Tr. at 22, 1529-1660). The ALJ noted that Claimant was capable of performing household chores if she has not experienced a seizure; that she never had a driver's license; that she quit school in the tenth grade because of seizures; and that she tried to obtain a General Equivalency Diploma but that she had to pay some money before she could finish. (Tr. at 21) The ALJ further considered that Claimant has three children, that their ages were 11, 4, and 2 and that Claimant takes care of all three and that the eldest child is adopted. (<u>Id</u>.) Finally, the ALJ considered that Claimant's husband works full-time and that he takes care of their children when Claimant has had a seizure. (<u>Id</u>.)

Next, the ALJ considered the testimony provided by Claimant's husband, Mr. Teeter, and that he had lived with Claimant for six years, that he works the evening shift and that when he is away, his father will stop by the house. (<u>Id</u>.) The ALJ noted that Mr. Teeter stated he worked close to the house and if necessary, he is able to run home. (<u>Id</u>.) The ALJ also considered Mr. Teeters' descriptions of Claimant's seizures, one being mild and the other being more severe; that he administers Claimant's medication and tries to get her to come out of the seizure; that Claimant

has small seizures all the time and that she has the more severe seizures two to three times a month. (Id.) Finally, the ALJ noted that Mr. Teeters stated that he also did not know when Claimant's seizures will occur. (Id.)

After properly performing the two-step process, the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Id.)

Next, the ALJ discussed the medical records, first recognizing that "[t]he objective findings do not corroborate the allegations to the disabling extent as asserted by the claimant." (Id.) The ALJ noted that even prior to the relevant period, "records from August 2015 revealed that her seizures were well controlled with medication until recently in which she was currently pregnant and reported increase of seizures due to pregnancy[,]" however, the ALJ noted that since the VNS implantation, additional records from August 2015 from Alastair Hoyt, M.D. "evidenced the claimant was doing well and even reported decrease in seizures with VNS" and that Dr. Hanif's records noted Claimant's seizures "were stable with Keppra, Topamax, and VNS." (Id.) The ALJ proceeded to discuss the medical records provided by Dr. Hanif, *supra*, which demonstrated Claimant's seizures had significantly decreased prior to and during the relevant period, save for the November 2016 episode when Claimant presented to the emergency room. (Tr. at 21-22)

Again, the ALJ noted that although Claimant experiences seizures, the evidence did not support her testimony regarding the frequency or severity of seizure, but "[i]n fact, the treatment record supports improvement with VNS and medication." (Tr. at 22) The ALJ noted that records from 2016 indicated that Claimant's seizures were well controlled and that in March 2018, "the

claimant only reported three seizures since August 2017." (Id.) Regarding her examinations, the ALJ noted that the record showed that they were essentially normal. (Id.) The ALJ again observed that Claimant "reported no difficulties performing activities of daily living" and that she takes care of three children, that she performs household chores, and that she tried to obtain a GED. (Id.) Finally, the ALJ determined that "[t]he overall record supports her condition is stable. Therefore, restricting the claimant to performing the range of work described above adequately addresses the location, duration, frequency and intensity of her alleged symptoms as well as precipitating aggravating factors." (Id.)

It is noted that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." See Manigo v. Colvin, 2015 WL 74954, at *5 (D. S.C. Jan. 6, 2015) (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id.

Given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). The ALJ

provided a thorough review that included not only Claimant's testimony, but also the objective medical evidence and other evidence of record, which included Claimant's own admitted activities. Frequently throughout the decision, the ALJ cited Claimant's treating physician's progress notes, wherein Dr. Hanif specifically noted that she was doing well on all her medications, aside from adjusting them occasionally, and to a lesser extent, modifying the VNS. Although the treatment notes do mention side effects from Claimant's medications, Claimant reported doing well on her medication regimen and that the side effects were manageable or resolved. It is significant that Dr. Hanif's records indicated that Claimant's seizures were generally stable and responded well to treatment, because Dr. Hanif had been treating Claimant for several years.

It is also significant that aside from Dr. Hanif's February 2016 opinion and medical source statement, the medical evidence of record does not demonstrate any functional limitations associated with Claimant's seizures or medications, accordingly, there is no reversible error here. See, e.g., McKinney v. Astrue, No. 5:06-cv-00998, 2008 WL 75109, at *18 (S.D.W.Va. March 19, 2008) (Johnston, J.). In short, the ALJ provided a fairly thorough and adequate review of Claimant's subjective complaints, reconciled them with the medical and other evidence of record, and ultimately determined that her symptoms did not limit her to the extent alleged.

The undersigned **FINDS** that the ALJ's subjective symptoms analysis complied with the pertinent Regulations and controlling case law and is based upon substantial evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other evidence of record in her evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law and supported by substantial evidence.

The RFC Assessment:

At steps four and five of the sequential analysis, the Regulations mandate that an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 416.946.

In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, Claimant takes issue with the RFC assessment insofar as the only medical opinion of record concerning Claimant's RFC is from Dr. Hanif, which he gave only little weight, and without any medical consultative opinion evidence, therefore, the ALJ's RFC determination is the product of lay opinion. (ECF No. 12 at 12) The Regulations state that medical opinions as they relate to a claimant's functional capabilities, thus, a "residual functional capacity . . . or the

26

application of vocational factors" are determinations reserved solely to the Commissioner. See 20 C.F.R § 416.927(d)(2). As stated earlier, to that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." <u>Id</u>. § 416.927(d)(3). The Regulations further empower the ALJ, not a physician, to make the ultimate determination of a claimant's residual functional capacity based on all of the evidence of record. <u>Id</u>. § 416.946(c) (the ALJ "is responsible for assessing your residual functional capacity"); <u>Id</u>. § 416.945(a) ("We will assess your residual functional capacity based on all the relevant evidence in your case record").

Accordingly, the "[RFC] is an administrative assessment made by the [ALJ] based on all the relevant evidence in the case record" and an ALJ is "not required to obtain expert medical opinion as the … RFC." <u>Felton-Miller</u>, 459 F. App'x at 231; <u>see Mays v. Barnhart</u>, 78 F. App'x 808, 813 (3d Cir. 2003) ("the ALJ is responsible for making a [RFC] determination . . . and he is not required to seek a separate expert medical opinion."); <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006) (There is no "legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."); <u>Fruit v. Colvin</u>, No. 2:14-cv-07643, 2015 WL 1021309, at * 22 (S.D.W.V. March 9, 2015) (Eifert, M.J.) ("[A]n ALJ is ***not*** required to obtain an expert  medical opinion as to a claimant's RFC") (***emphasis*** in original); <u>Moore v. Colvin</u>, No. 0:15-cv-425-MGL, 2016 WL 1714117 (D.S.C. Apr. 29, 2016) ("the ALJ is not required to rely on medical opinions to formulate an RFC assessment, as the 'ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision.' ") (quoting <u>Chandler v. Comm'r of Soc. Sec.</u>, 67 F.3d 356, 361 (3d Cir. 2011).

Therefore, to the extent the ALJ erred because he did not solicit additional medical opinions prior to assessing Claimant's RFC, this argument lacks merit.

Nevertheless, as pointed out by the Commissioner (ECF No. 17 at 17), the RFC assessment does incorporate several restrictions that Claimant's own treating neurologist endorsed: that she can never work with moving mechanical parts or operate a motor vehicle (See Tr. at 20, 242, 244, 245); that she can never work at unprotected heights (See Tr. at 20, 243); that she must work in a low stress environment (See Tr. at 20, 248); that she can sit, stand or walk up to two hours in an eight-hour workday (See Tr. at 20, 249); and that she can lift and carry 10 pounds occasionally and less than 10 pounds frequently and push/pull as much as she can lift and carry, as she has no "significant limitations with reaching, handling or fingering" or other specified lifting or carrying restrictions (See Tr. at 20, 251). In addition to the ALJ's review of the medical evidence of record that demonstrated Claimant's seizures were well controlled by medication and VNS as well as essentially normal physical examinations, plus Claimant's own statements concerning what activities she remained capable of, it is clear that the RFC assessment complied with the controlling Regulations and jurisprudence. Accordingly, the undersigned **FINDS** that the ALJ's RFC determination is supported by substantial evidence.

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court

**DENY** the Claimant's request for remand (ECF No. 12), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 10, 2020.

Omar J. Aboulhosn
United States Magistrate Judge